UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD XAVIER COLLINS,<br><br>                Plaintiff,<br><br>     v.<br><br>UNITED STATES OF AMERICA,<br><br>                Defendant. | Case No.: 5:20-cv-02582-MEMF (SHKx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL AND ORDER DENYING MOTION FOR JUDGMENT ON PARTIAL FINDINGS [ECF NO. 120]** |

      The Court held a bench trial in this matter from June 24, 2024, to June 26, 2024. Currently before the Court is Defendant United States of America's Motion for Judgment on Partial Findings. ECF No. 120. Pursuant to Fed. R. Civ. P. 52, the Court renders its Findings of Fact and Conclusions of Law. Based on these findings, the Court DENIES the United States of America's Motion and will enter judgment for Collins as described below.

    **I.**    <u>**Background**</u>

      Plaintiff Ronald Xavier Collins ("Collins") is a former prisoner at the Federal Correctional Complex in Lompoc, California. *See* ECF No. 31. He alleges that while incarcerated, he underwent a colonoscopy, and that complications followed that were not properly treated. *See id.* In particular, he

alleges that he suffered from an enterovesical fistula, and that he suffered further when prison staff required him to wear shackles on his ankles during treatment, causing injuries to his ankles. *See id.* ¶¶ 14–16.

Collins filed suit in this Court on December 15, 2020. ECF No. 1. On October 25, 2021, Collins filed his First Amended Complaint. ECF No. 31 ("FAC"). Collins brings one cause of action: medical negligence under the Federal Tort Claims Act ("FTCA").[1] *See id.* Collins brings this claim against Defendants United States of America (the "government"), United States Department of Justice Bureau of Prisons ("BOP"), Michael Carvajal—the former Director of the BOP, and Dr. William Watson—a BOP general practitioner (collectively, "Defendants"). *See id.* The United States answered on November 15, 2021. ECF No. 32.

## II. Applicable Law

"In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). If at the conclusion of a non-jury trial, "the court finds against [a] party on [an] issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." *See* Fed. R. Civ. P. 52(c). "A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)." *Id.*

## III. Credibility Findings

1. The Court generally found Dr. Watson's testimony on disputed issues in this case not credible, for the reasons stated on the record in the Court's tentative ruling at the close of trial. *See* ECF No. 117 at 51–53 (Trial Tr. 51:14–53:02, June 26, 2024).

2. The Court generally found Collins's testimony on disputed issues in the case to be credible, and to the extent he made contradictory statements (*e.g.*, about specific timelines), they appeared to be small discrepancies in memory based on the passage of time rather than efforts to lie.

---

[1] Prior to trial, the parties disputed which causes of action remained at issue. The Court examined the record and determined that Collins had abandoned all causes of action except his FTCA claim, and thus the FTCA claim was the only cause of action. *See* ECF No. 101. As discussed below, Collins requests that the Court permit a post-trial amendment, but he does not seek reconsideration of the Court's prior Order that held he abandoned other claims. *See* ECF No. 121 at 17.

IV. **Findings of Fact**[2]

    A. **Collins Underwent a Colonoscopy and Experienced Urinary Symptoms Thereafter.**

3. Collins was transferred to the Federal Correctional Complex in Lompoc, California ("FCC Lompoc") in February of 2017. *See* ECF No. 116 at 7–8 (Trial Tr. 7:20–8:01, June 25, 2024).

4. On June 2, 2017, Collins underwent a colonoscopy[3] and then returned to FCC Lompoc. *See id.* at 143 (Trial Tr. 143:02–05, June 24, 2024); *see also* Ex. 106.

5. Collins was made to wear shackles on his ankles on the day of colonoscopy, and the shackles cut his lower legs. *See* ECF No. 116 at 11–12 (Trial Tr. 11:20–12:07, June 25, 2024).

6. The cuts to Collins's legs caused his legs to bleed, and he wrapped his legs in towels upon returning to his cell. *See id.*

7. The day after the colonoscopy, Collins noticed air coming out of his penis when he urinated, at which point he requested medical attention for both this issue and the injuries to his ankles. *See id.* at 12–14 (Trial Tr. 12:12–13:08, June 25, 2024).

8. The air coming out of Collins's penis while urinating was caused by an enterovesicular fistula[4] as a result of complications with the colonoscopy.

9. The documentation from June 2, 2017 (the day of the colonoscopy), does not note specifically that Collins complains of any urinary tract symptoms or leg ulcerations. *See* Ex. 106.

---

[2] Any finding of fact or credibility finding deemed to be a conclusion of law is hereby incorporated into the Conclusions of Law. Any conclusion of law deemed to be a finding of fact is hereby incorporated into the Findings of Fact.

[3] A "colonoscopy" is an "[e]xamination of the inside of the colon" using a "thin, tube-like instrument with a light and a lens for viewing," which is "inserted into the rectum." *See Colonoscopy*, NATIONAL CANCER INSTITUTE, last visited March 9, 2025, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/colonoscopy.

[4] An "enterovesicular fistula" means a connection between the bowels and the bladder. *See* ECF No. 111 at 22–23 (Trial Tr. 22:16–23:03, June 24, 2025). The Court notes that some public sources use the term "enterovesic*al* fistula" as opposed to "enterovesic*ular* fistula." *See, e.g.*, Maxim Shaydakov et al., *Enterovesical Fistula*, NATIONAL LIBRARY OF MEDICINE, May 2, 2023, https://www.ncbi.nlm.nih.gov/books/NBK532936/. The Court understands each of these, and "GI to vesicle fistula" (*see, e.g.*, Ex. 115), to refer to the same condition.

10. On June 8, 2017, less than a week after his colonoscopy, Collins saw Defendant Dr. Watson, a Bureau of Prisons ("BOP") general practitioner,[5] and reported urinary tract symptoms. *See* ECF No. 116 at 14 (Trial Tr. 14:11–21, June 25, 2024); *see also* Ex. 107.

11. Dr. Watson told Collins that it was "impossible" that air was coming out of his penis after a colonoscopy, did not believe Collins, and diverted the conversation to discussing Dr. Watson's dogs. *See* ECF No. 116 at 14 (Trial Tr. 14:11–21, June 25, 2024).

12. Dr. Watson ordered a "urine test for possible blood on urine." *See* Ex. 107.

13. On June 15, 2017, Collins saw another BOP doctor and reported "urinating 'air'" and "peeing blood," which was documented in a report. *See* Ex. 109.

14. On July 7, 2017, Collins saw Dr. Watson again, and Collins requested that Dr. Watson listen to Collins urinate so that Dr. Watson could hear the air coming out of his penis. *See* ECF No. 116 at 15–16 (Trial Tr. 15:17–16:04, June 25, 2024); *see also* Ex. 112.

15. Dr. Watson heard the sound, and remained skeptical, suspecting that Collins may have had a spray bottle to produce the noise of air being emitted, but eventually believed Collins that Collins was experiencing air coming out of his penis during urination. *See* ECF No. 116 at 16 (Trial Tr. 16:01–16:10, June 25, 2024).

16. Dr. Watson noted, with respect to the July 7, 2017, visit that "[Collins's] main complaint is the persistence of gas being passed from his penile urethra. He has occasional 'a little' pain on urination, 'mild burning.'" *See* Ex. 112.

17. After the visit on July 7, 2017, Dr. Watson diagnosed Collins with a urinary tract infection ("UTI"), and prescribed treatment for that condition. *See* Ex. 112-2; *see also* ECF No. 111 at 139 (Trial Tr. 139:20–22, June 24, 2024).

18. Around this time, Collins continued to suffer from ulcers on his leg as a persistent symptom from the initial injury from the shackles. *See* ECF No. 116 at 21 (Trial Tr. 21:08–15, June 25, 2024).

---

[5] A "general practitioner" is a doctor "whose practice is not limited to a specialty," also known as a "generalist" doctor. *See general practitioner*, MERRIAM-WEBSTER, last visited March 9, 2025, https://www.merriam-webster.com/dictionary/general%20practitioner.

19. On July 27, 2017, Collins Dr. saw both Dr. Watson and a non-BOP general surgeon,[6] Dr. Bandhit Sinkaset. *See* Ex. 115; *see also* ECF No. 111 at 142 (Trial Tr. 142:07–15, June 24, 2024).

### B. Collins was Diagnosed with a Fistula.

20. Dr. Watson noted, with respect to the July 27, 2017, visit that Collins was treated for a UTI and his symptoms returned; Dr. Watson's assessment was that Collins suffered from an anal fistula and that it was necessary to rule out an enterovesicular fistula. *See* Ex. 115 (Dr. Watson's report stated that Collins "was treated presumptively for UTI," but "[s]ymptoms have returned," and under the header "ASSESSMENT," Dr. Watson wrote: "Anal fistula, K603 - Current - *rule out GI to Vesicle Fistula*.").[7]

21. Dr. Watson's plan from the July 27, 2017, visit was for Collins to receive an abdominal x-ray to "evaluate for free air in bladder." *See id.* ("General Radiology-Abdomen-Upright . . . Please evaluate for free air in bladder.").[8]

22. On August 21, 2017, Collins saw Victoria Balogun, a BOP nurse practitioner,[9] who indicated that Collins was "presenting with passing gas through penis and penile drainage x 2 months" and "denies . . . hematuria."[10] *See* Ex. 120.

### C. Collins's Medical Records Indicated that He was Not to Be Placed in Leg Irons, but He Continued to be Placed in Leg Irons.

---

[6] A "general surgeon" is a "doctor[] who specialize[s] in surgical procedures." *See* Nayana Ambardekar, *What Is a General Surgeon?*, WEBMD, July 16, 2023, https://www.webmd.com/a-to-z-guides/what-is-general-surgeon.

[7] The Court understands "GI" to mean gastrointestinal, and so understands this to be a reference to an enterovesicular fistula, a connection between the bowels and bladder. *See Your Digestive System & How it Works*, NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASE, last visited March 10, 2025, https://www.niddk.nih.gov/health-information/digestive-diseases/digestive-system-how-it-works.

[8] The Court understands "radiology" to be a reference to an X-Ray. *See* Ex. 116.

[9] A "nurse practitioner" is "is a nurse who has advanced clinical education and training." *See Nurse Practitioner*, CLEVELAND CLINIC, last visited March 10, 2025, https://my.clevelandclinic.org/health/articles/24651-nurse-practitioner.

[10] "Hematuria" means blood in the urine. *See* ECF No. 111 at 19 (Trial Tr. 19:13–17, June 24, 2025).

23. On August 26, 2017, Teala Doeppke, a BOP emergency medical technician,[11] prepared a "Health Services: Inmate Report" which stated as to Collins (in a section titled "Limitations/Restrictions/Diets"): "No leg irons --- permanent." *See* Ex. 2.

24. In the months that followed, Collins kept on his person the form that he believed entitled him to not have his ankles shackled (based on the above); he was nevertheless informed that if he refused shackles he would not be permitted to attend medical appointments. *See* ECF No. 116 at 23 (Trial Tr. 23:06–25, June 25, 2024).

25. The documentation stating that Collins should not have leg irons was generally not followed, and leg irons generally continued to be placed on Collins when he attended his medical appointments. *See, e.g.*, *id.*

**D.    Collins was Seen by a Urologist for the First Time.**

26. On September 5, 2017, Collins again saw Dr. Watson for pain management, and Dr. Watson determined that he was "doing pretty well as he awaits his Urology" appointment. *See* Ex. 121.

27. On September 21, 2017—for the first time since reporting symptoms several months earlier—Collins saw a urologist, Dr. Samuel Kieley. Dr. Kieley was a non-BOP urologist and Collins saw him outside of FCC Lompoc. *See* Ex. 122; *see also* ECF No. 116 at 114 (Trial Tr. 114:01–16, June 25, 2024).

28. Dr. Kieley's noted the following complaints from Collins: "Chief Complaint: passing air and urine through urethral;" "the hematuria has been there for 2–3 months;" "feels the symptoms began shortly after an EGD and colonoscopy."[12] *See* ECF No. 122.

29. Dr. Kieley discussed with Collins that he was likely suffering from a fistula. Dr. Kieley's plan for Collins was two-fold: (1) Collins was to undergo a cystoscopy with biopsy in 1-2

---

[11] An "emergency medical technician" or "EMT" is "a specially trained medical technician certified to provide basic emergency services . . . before and during transportation to a hospital." *See EMT*, MERRIAM-WEBSTER, last visited March 9, 2025, https://www.merriam-webster.com/dictionary/EMT.

[12] An "EGD" or "upper endoscopy," is a procedure where a scope is inserted into the esophagus, stomach, and small intestine for diagnosis. *See EGD Procedure (Upper Endoscopy)*, CLEVELAND CLINIC, last visited March 10, 2025, https://my.clevelandclinic.org/health/procedures/22549-egd-procedure-upper-endoscopy

6

weeks; and (2) Collins was to have an evaluation by a general surgeon. *See* Ex. 122 at 3 (notes from the September 21, 2017, visit stated the following under the header "Plan": "discussed likely fistula," "cysto with biopsy in 1–2 weeks," and "gen surg eval").

30. Collins did not see a general surgeon for the evaluation recommended by Dr. Kieley until November 30, 2017, when he again saw Dr. Sinkaset, the non-BOP general surgeon. *See* Ex. 133.

### E. Collins Continued to Suffer from Leg Ulcers and Continued to Have Leg Irons Placed

31. On January 19, 2018, Collins visited a BOP provider—physician's assistant Lisa Hoen—to receive treatment for leg ulcers; the notes from the visit state "Inmate had leg irons on for a medical trip 'about 3 weeks ago, and my ankles got cut and they won't heal.'" *See* Ex. 144.

32. The physician assistant's notes also stated that Collins was not to have leg irons on medical trips. *See id.* at 2 ("MDS: no leg irons on medical trips" under a section entitled "Other.").

33. This note prohibiting leg irons was not followed. *See* ECF No. 116 at 38, 156–57 (Trial Tr. 38:15–32, 156:03–157:11, June 25, 2024).

34. On January 24, 2018, Collins saw the urologist Dr. Kieley again for the planned cystoscopy; Collin's chief complaint was that he was passing air through his penis, and Dr. Kieley noted that he was concerned that there was an enterovesical fistula and that Collins should be referred to a general surgeon. *See* Ex. 142 at 1, 10 (note read: "Chief Complaint: passing air/ gross hematuria;" "cysto – apparent fistula posterior wall;" "gross hematuria and pneumaturia, concerning for enterovesical fistula;"[13] and, under the header "Assessment/Plan," "will need referral to general surgery for eval and treatment.")

### F. Collins Began Refusing Medical Treatment.

---

[13] "Pneumaturia" means the passing of urine and air together while urinating. *See* ECF No. 111 (Trial Tr. 18:20–24, June 24, 2024).

7

35. On February 12, 2018, Collins refused treatment for his fistula because he understood that his legs would need to be shackled for the procedure, and the shackling was causing him significant pain. *See* ECF No. 116 at 38 (Trial Tr. 38:15–32, June 25, 2024).

36. That day, he was handed a blank "Medical Treatment Refusal" form from a stack of blank forms, and he signed it. See ECF No. 117 at 39, 41 (Trial Tr. 39:16–22, 41:07–15, June 26, 2024).

37. The form contains sections where the patient's condition should be described in "layman's terminology," where the treatment recommended is described, and where the risks of refusal are described. *See* Ex. 148.

38. The form as presented to the Court was filled out to indicate that Collins had been set to be evaluated for a "possible fistula between lower bowel and bladder," and states that it was explained to Collins that the risks of refusing treatment include "[i]llness, injury, [and] delay in diagnosis," and included bold text at the bottom, beneath the filled in portions described above, which stated that "I understand the possible consequences and/or complications, listed above, and still refuse recommended treatment." *See* Ex. 148.

39. At the time Collins signed the form, both the sections regarding Collin's condition, the treatment recommended, and the risks were blank. *See* ECF No. 117 at 39, 41 (Trial Tr. 39:16–22, 41:07–15, June 26, 2024).

40. At some point after Collins signed the form, the other portions of the form were filled out; Collins did not see the completed form until it was produced in this litigation. *See id*.

41. On February 21, 2018, Collins saw another BOP provider—nurse practitioner Galyna Mishchenko—to receive treatment for his leg ulcers; the notes from this visit do not mention the possible fistula or the urinary symptoms. *See* Ex. 178.

42. On February 26, 2018, Collins again saw the urologist Dr. Kieley, who wrote that Collins was "doing well" but "still having pneumaturia;" Dr. Kieley assessed Collins with an enterovesicular fistula and again recommended that he see a general surgeon. *See* Ex. 150. ("Enterovesical fistula [line break] to see gen surg.").

43. On March 1, 2018, Collins signed another blank "Medical Treatment Refusal" form, which was later filled out to indicate that he refused "to show up for daily wound care." *See* Ex. 151; *see also* ECF No. 117 at 39, 41 (Trial Tr. 39:16–22, 41:07–15, June 26, 2024).

44. There were no further doctor's visits focused on the urinary symptoms, nor did Collins ever see a general surgeon for his symptoms after Dr. Kieley recommended as such in February of 2018.

45. If Collins had undergone surgery for the fistula, there would have been risks involved in the procedure based on Collins's overall condition. *See* ECF No. 116 at 134–135 (Trial Tr. 134:12–135:25, June 25, 2024).

46. When Collins was incarcerated at FCC Lompoc, he generally paid $2 per medical visit. *See id.* at 66–67 (Trial Tr. 66:23–67:19, June 25, 2024).

**G.    Collins was Transferred Out of Prison and Continues to Have Evidence of Ankle Ulcers.**

47. Collins was transferred out of FCC Lompoc on May 7, 2018. *See* ECF No. 116 at 54 (Trial Tr. 54:05–07, June 25, 2024).

48. As of the date of trial in June 2024, Collins's ankles had visible evidence of cuts and infection, including white discoloration, but no open ulcers or bleeding.[14]

**V.    Conclusions of Law**

49. Collins's only claim is for medical negligence in violation of the FTCA. *See* ECF No. 101.

50. The FTCA provides a remedy for medical negligence against the United States, and such claims are governed by the substantive law "of the place where the act or omission occurred." *See* 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2679(b)(1).

51. Under California law, the elements of a claim for medical malpractice are: "(1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and

---

[14] During trial, Collins showed his ankles in open court and the Court personally observed Collins's condition (as of the time of trial) in close quarters.

9

exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." *Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (2015); *see also Johnson v. Superior Ct.*, 143 Cal. App. 4th 297, 305 (2006).

49. The first element—establishing the duty or "standard" of care—is critical in a medical negligence action, and generally requires expert testimony. *See Lattimore*, 239 Cal. App. 4th at 968. Collins's only evidence as to the standard of care came from the government's experts, who testified generally that the standards of care as to various issues were not breached by the conduct described.

52. There are exceptions to the rule stated immediately above; a plaintiff can prevail in a medical negligence action without using expert testimony to establish a standard of care if "the circumstances are such that the required conduct is within the layperson's common knowledge." *See id.*

53. One way in which a plaintiff may prevail without using an expert to establish the standard of care is by relying on the doctrine of *res ipsa loquitar* ("the thing speaks for itself"), *see id.* at 968 n.3—this doctrine allows a plaintiff to prove a negligence claim (medical negligence or otherwise) by showing the following:

> (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) and it must not have been due to any voluntary action or contribution on the part of the plaintiff.

*Brown v. Poway Unified Sch. Dist.*, 843 P.2d 624, 627 (1993)

54. In the context of medical negligence specifically, California courts have allowed plaintiffs to prevail on the theory of *res ipsa loquitar* in situations such as: "a scalpel left in the patient's body following surgery," "where the patient was burned by the application of hot compresses or heating apparatus," and "where the patient was burned through the operation of an X-ray machine," and "where the patient sustained an infection through the use of an unsterilized hypodermic needle." *See Engelking v. Carlson*, 88 P.2d 695, 698 (1939), *overruled in part by Seneris v. Haas*, 291 P.2d 915, 925 (1955)*, and disapproved of by Siverson v. Weber*, 372 P.2d 97, 98 (1962) (collecting cases).

55. *Res ipsa loquitar* applies "where the accident is of such a nature that it can be said, in the light of past experience, that it *probably* was the result of negligence by someone and that the defendant is *probably* the person who is responsible." *Siverson*, 372 P.2d at 98 (emphasis added).

56. Here, Collins failed to establish the standard of care as to any of the following issues via expert testimony: (1) how quickly his enterovesicular fistula should have been diagnosed based on his symptoms; (2) how his enterovesicular fistula should have been treated; (3) how quickly he should have been taken to see specialists after a referral; (4) how a general practitioner should have handled the combination of facts that Collins had been referred to a specialist but Collins had refused further treatment; (5) whether and in what specific contexts it is appropriate to shackle a prisoner's ankles during medical treatment; or (6) how the injuries to his ankles should have been treated.

57. Thus, Collins can only prevail on his FTCA claim for medical negligence through a theory of *res ipsa loquitar*.

58. A lay person is not capable of determining whether a delay in diagnosing an enterovesicular fistula based on a specific set of symptoms can only occur through negligence, and so Collins cannot show medical negligence based on *res ipsa loquitar* for a delay in diagnosis.

59. A lay person is not capable of determining whether a specific course of treatment is appropriate for an enterovesicular fistula based on a specific set of symptoms, and so Collins cannot show medical negligence based on *res ipsa loquitar* for the specific steps taken or not taken to treat his enterovesicular fistula.

60. A lay person is not capable of determining when a patient should be referred to a specialist for treatment based on a specific set of symptoms, or whether the failure to promptly refer a patient to a specialist constituted negligence, and so Collins cannot show medical negligence based on *res ipsa loquitar* for a failure to promptly refer Collins to a specialist.

61. A lay person is not capable of determining how a general practitioner should handle the combination of facts that Collins had been referred to a specialist but Collins had refused further treatment, and so Collins cannot show medical negligence based on *res ipsa loquitar* for a failure to promptly arrange for Collins to see a specialist after doctors recommended that he do so.

62. Collins established a standard of care that a general practitioner should at least consider the recommendations of a specialist. *See* ECF No. 116 at 104 (Trial Tr. 103:06–17, June 25, 2024). He failed to show that the specialist's recommendations were not considered—or even that they were not followed—and thus failed to show a breach of that purported duty—(1) after Dr. Kieley recommended that Collins see a general surgeon in September of 2017, Collins saw Dr. Sinkaset, a general surgeon, in November of 2017, and Collins has not shown that this timing was a breach of the duty; and (2) after Dr. Kieley recommended that Collins see a general surgeon in February of 2018, although Collins never saw a surgeon, Collins's signing of refusal of medical care form complicates the issue, and Collins has not established any standard of care for how a general practitioner should have handled that situation.

63. A lay person is not capable of determining how the injuries to Collins's ankles should have been treated, and so Collins cannot show medical negligence based on *res ipsa loquitar* for a the way in which treatment to his ankle injuries occurred.

64. A lay person is capable of determining that where a person has visible injuries to his or her ankles, and where notes exist in the person's medical files stating that the person should not be made to wear ankle shackles, it is negligence to apply ankle shackles to the visible injuries—thus, Collins may proceed on a theory of *res ipsa loquitar* based on this.

65. Collins had visible injuries on his ankles that required ongoing treatment, and had notes in his file suggesting he should not be shackled, and nevertheless he was shackled on his ankles when undergoing further treatment—this constituted a breach of the duty of care.

66. The breach of the duty of care identified above exacerbated Collins's injuries and caused harm that Collins continues to suffer from to this day.

67. Collins has not shown that he incurred any monetary harm from the injuries to his ankles in the form of specific medical bills or any other form.

68. Collins has shown that he experienced pain and suffering from the injuries to his ankles, and that this pain and suffering continued to some extent from 2017 to the time of trial.

69. Collins has also shown that he refused treatment for other conditions because of the pain he suffered from shackles, and this refusal of treatment resulting from the pain caused additional pain and suffering.

70. Collins has therefore shown that the government is liable for medical negligence for the injuries to his ankles, as he has shown a duty, a breach thereof, proximate cause, and resulting harm.

71. The Court must next determine damages—the "components and measure of damages in FTCA claims are taken from the state where the tort occurred," and so the Court will apply California law to determine damages. *See Shaw v. United States*, 741 F.2d 1202, 1205 (9th Cir. 1984).

72. Under California law, a plaintiff in a medical malpractice action may recover "noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage," but such damages are limited to $350,000.[15] *See* Cal. Civ. Code § 3333.2(a)(1).

73. Determining non-economic damages is inherently difficult, and no one method is recognized for doing so—the determination is left to the discretion of the finder of fact. *See Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276, 299–300 (2017).

74. The Court's determination of non-economic damages should "rest[] primarily on the facts and circumstances of this case," but it is nevertheless appropriate to consider damages awards in other similar cases in order to determine whether an award is appropriate. *See id.* at 302–303; *see also Jutzi-Johnson v. United States*, 263 F.3d 753, 759 (7th Cir. 2001) ("To minimize the arbitrary variance in awards bound to result from such a throw-up-the-hands approach, the trier of fact should . . . be informed of the amounts of pain and suffering damages awarded in similar cases."); *Davis v. United States*, 670 F.3d 48 (1st Cir. 2012) ("The closest thing to an objective measure is

---

[15] Until 2023, the law limited damages to $250,000. *See, e.g.*, *Hoffman v. United States*, 767 F.2d 1431, 1433 (9th Cir. 1985). The Court need not settle how to address this change in law, as the Court will award an amount less than $250,000.

itself nothing other than the composite of subjective judgments reflected in other awards in like cases.").

75. Here, in determining damages, the Court relied on its own viewing of Collins's injuries in open court, and on the following facts described above in considering its damages award—Collins suffered an injury to the skin on and around his ankles that cause some degree of pain and suffering from pain from 2017 to the time of trial; Collins also refused other medical treatment as a result of this pain, exacerbating other medical issues; but Collins did not suffer a full loss of the use of his ankles or legs as a result of his pain and suffering.

76. Neither party pointed to any similar cases on which the Court might base its damages award.

77. The Court's understanding is that medical malpractice law is fundamentally similar across various state, and so, although the Court is applying California law as to damages, the Court finds it appropriate to consider damages awards from other states in addition to California in determining an appropriate damages award for the injury here.

78. The Court performed its own research into damages awards for pain and suffering (or other similar categories of non-economic damages) based on surface-level injuries to the legs or ankles and identified several cases that appear somewhat similar. *See Scott v. Goldberger, M.D.*, Case No. MRS-L-2185-16, 2020 WL 871382 (N.J. Super. Ct. Law Div. Jan. 14, 2020) ($550,000 in pain and suffering damages for deep vein thrombosis in ankle due to medical malpractice*); Thomas Bright, v. The Guilford Mooring, L.L.C.*, Case No. NNH-CV-17-6070220-S, 2019 WL 8633947 (Conn. Super. Ct. Nov. 19, 2019) ($210,000 in noneconomic damages for nerve injury to leg); *Frances Cline v. Charles E. Eiseman, Jr. and Mary L. Eiseman*, Case No. 2017-2-23038-3, 2018 WL 3069715 (Wash. Super. Ct. Apr. 23, 2018) ($65,000 in noneconomic damages for permanent calf discoloration and swelling); *Thibodeaux v. Gulfgate Const., LLC*, Case No. C20154167, 2018 WL 3202592 (La. Dist. Ct. Apr. 06, 2018) ($245,000 in pain and suffering damages for injuries to legs that required two surgeries and caused permanent arthritis); *Noah Krasman v. Jamie Shelly et al*, Case No. 2017-160802-NI, 2018 WL 6809705 (Mich. Cir. Ct. Nov. 27, 2018) ($8,500 in pain and suffering damages for nerve damage and scarring to legs); *Lozano v. Smith*, Case No. DC-17-06568,

2019 WL 4280232 (Tex. Dist. Aug. 26, 2019) ($2,500 in pain and suffering damages for temporary bruising and abrasions to legs).

79.   Having reviewed the record in this action and the other authorities discussed above, the Court finds it appropriate to award Collins $100,000 in noneconomic damage for the injuries he suffered.

80.   Although the FTCA limits the attorneys' fees that may be charged, *see Campbell v. United States*, 835 F.2d 193, 196 (9th Cir. 1987); *see also* 28 U.S.C. § 2678, it does not contain any provision authorizing a court to award attorneys' fees to a prevailing party.

**VI.   Discussion**

For the reasons stated above, the Court DENIES the government's Motion for Judgment on Partial Findings (ECF No. 122). The Court finds that the facts establish that Collins has proven his claim as described above.

Collins also requests that the Court allow a post-trial amendment to assert a *Bivens* claim. *See* ECF No. 121 at 17. Under Federal Rule of Civil Procedure 15(b)(2), a "party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." *See* Fed. R. Civ. P. 15(b)(2). Collins has provided no authority suggesting that a *Bivens* claim—which requires a violation of constitutional rights by a federal officer, *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)—would be valid based on the facts shown. Although the Court finds evidence suggesting negligence, Collins has not shown any violation of his constitutional rights based on the facts at trial, or provided any authority suggesting that there was such a violation based on the facts shown. Thus, the request for a post-trial amendment is DENIED.

Finally, Collins also requests attorneys' fees. *See* ECF No. 121 at 17. Collins has provided no authority suggesting this is appropriate. Collins points to 28 U.S.C. § 1346(b)(1), but this provision simply gives courts exclusive jurisdiction over certain claims against the United States and does not authorize awards of attorneys' fees. *See* 28 U.S.C. § 1346(b)(1). Collins also points to *Tri-State Hospital Supply Corporation v. United States*, where the D.C. Circuit held that a plaintiff may win attorneys' fees against the United States where either (A) the government takes a substantially

unjustified position in the underlying civil litigation, or (B) any other defendant would have been liable for attorneys' fees under state law. *See Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 580 (D.C. Cir. 2003). *Tri-State* is not binding on this Court, but even if it were, it would not permit a fee award here, as Collins has neither shown that the government took a substantially unjustified position nor that California law permits an award of attorneys' fees in a medical negligence claim. Thus, Collins' request for a fee award is DENIED.

## VII.  Conclusion

For the reasons stated herein, the Court ORDERS as follows:

1. The government's Motion for Judgment on Partial Findings (ECF No. 122) is DENIED.
2. Judgment shall be entered in favor of Collins for $100,000.

IT IS SO ORDERED.

Dated: March 31, 2025

MAAME EWUSI-MENSAH FRIMPONG
United States District Judge